UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

FAIR HOUSING IN HUNTINGTON     :
COMMITTEE, HUNTINGTON BRANCH,
NAACP, BERNARD PEYTON, ATHENA    :
HAWKINS, LYNDA JOHN and IAN JOHN,     CV 02 2787 (DRH) (WDW)
    :
                Plaintiffs,     <u>ELECTRONICALLY FILED</u>
    :
    v.                     :

TOWN OF HUNTINGTON, NEW YORK,
TOWN BOARD OF THE TOWN OF     :
HUNTINGTON, TOWN OF
HUNTINGTON PLANNING BOARD,     :

              Defendants.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


# PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT
# OF THEIR MOTION FOR A PRELIMINARY INJUNCTION

Jeffrey Glekel (jeffrey.glekel@skadden.com)
Gary J. Hacker (gary.hacker@skadden.com)
SKADDEN, ARPS, SLATE
   MEAGHER & FLOM LLP
Four Times Square
New York, NY  10036
(212) 735-3000

Attorneys for Plaintiffs

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ............................................................................................ iii

PRELIMINARY STATEMENT .......................................................................................1

PROCEDURAL HISTORY .............................................................................................3

FACTUAL BACKGROUND ...........................................................................................5

ARGUMENT ..................................................................................................................10

I.       LEGAL STANDARD FOR INJUNCTIVE RELIEF ....................................................10

II.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR
CLAIMS ...............................................................................................................10

        A.     The Town Has Engaged In Intentional Discrimination in Violation of the
Fair Housing Act and Other Applicable Civil Rights Laws ................................11

              1.     The Town's Actions With Regard to Ruland Road Will Have a
Discriminatory Impact on Families with Children and Minorities ..........13

              2.     The Historical Background of the Town's Decisions Demonstrate a
Pattern and Practice of Discrimination .....................................................13

              3.     The Specific Sequence of Events Reveals Defendants'
Discriminatory Intent ................................................................................15

              4.     Defendants Have Departed From Normal Procedural Sequences
and Normal Substantive Criteria ..............................................................17

        B.     The Town's Actions Relating to the Ruland Road Project Have a Disparate
Impact on Families with Children and Minorities In Violation of the Fair
Housing Act .......................................................................................................19

              1.     The Town's Insistence On An All One-Bedroom Plan for Ruland
Road Will Have A Discriminatory Impact on Families with
Children and Minorities .............................................................................20

                   (a)     Disparate Impact on Families with Children ................................21

                   (b)     Disparate Impact on Minorities ...................................................21

              2.     The Towns' Insistence On An All One-Bedroom Plan for Ruland
Road Perpetuates Segregation ...................................................................22

3.      The Town Has Not Proffered Any Legitimate Justification for An
All One-Bedroom Plan ............................................................................22

III.    PLAINTIFFS WILL BE IRREPARABLY HARMED IF AN INJUNCTION IS
NOT ISSUED.................................................................................................................23

A.      It Is Presumed that Plaintiffs Have Been Irreparably Harmed Because of
Defendants' Discriminatory Conduct..................................................................24

B.      Plaintiffs Have Independently Demonstrated That They Will Be
Irreparably Harmed By Defendants' Discriminatory Conduct .............................24

CONCLUSION.....................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                      **Page(s)**

*2922 Sherman Avenue Tenants' Association v. District of Columbia*,
444 F.3d 673 (D.C. Cir. 2006) ...................................................................17

*Atkins v. Robinson*, 545 F. Supp. 852 (E.D. Va. 1982) .........................................14, 15

*Bronson v. Crestwood Lake Section 1 Holding Corporation*,
724 F. Supp. 148 (S.D.N.Y. 1989) .............................................................23

*Charleston Housing Authority v. United States Department of Agriculture*,
419 F.3d 729 (8th Cir. 2005) ......................................................................20

*Dews v. Town of Sunnyvale*, 109 F. Supp. 2d 526 (N.D. Tex. 2000) ..........................17

*Fair Housing Council of Orange County, Inc. v. Ayres*,
855 F. Supp. 315 (C.D. Cal. 1994) ................................................... 11, 19, 21

*Fair Housing in Huntington Committee Inc. v. Town of Huntington, New York*,
316 F.3d 357 (2d Cir. 2003) ........................................................................4

*Fair Housing in Huntington Committee v. Town of Huntington*, No. 02-CV-2787
(DRH) (WDW), 2005 WL 3184273 (E.D.N.Y. Nov. 29, 2005)................... 2, 3, 5, 17, 19

*Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417 (11th Cir. 1984) .......................24

*Hills v. Gautreaux*, 425 U.S. 284 (1976)......................................................................23

*Huntington Branch, N.A.A.C.P. v. Town of Huntington*,
844 F.2d 926 (2d Cir. 1988),................................................................*passim*

*LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412 (2d Cir. 1995) ..............................11, 12

*Resident Advisory Board v. Rizzo*, 564 F.2d 126 (3d Cir. 1977)................................23

*Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328 (2d Cir. 1995) ...................................10

*Stewart B. McKinney Foundation, Inc. v. Town Plan & Zoning Commission*,
790 F. Supp. 1197 (D. Conn. 1992) ............................................................24

*Sunrise Development, Inc. v. Town of Huntington, New York*,
62 F. Supp. 2d 762 (E.D.N.Y. 1999)................................................. 12, 17, 24

*United States v. Yonkers Board of Education*, 837 F.2d 1181 (2d Cir. 1987) ..................12, 14

*Valdez v. Town of Brookhaven*, No. 05-CV-4323(JS)(ARL),
2005 WL 3454708 (E.D.N.Y. Dec. 15, 2005) ................................... 13, 19, 23

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
429 U.S. 252 (1977) ..............................................................................11, 12, 13, 15, 18

*Villages of Cornwallis Owners Association v. Durham Housing Authority*,
894 F. Supp. 236 (M.D.N.C. 1995).........................................................................24, 25

*Washington v. Davis*, 426 U.S. 229 (1976) ...............................................................................12

**Statutes**

42 U.S.C. § 3601...........................................................................................................................10

42 U.S.C. § 3604(a) ................................................................................................................10, 11

Plaintiffs Fair Housing in Huntington Committee, Huntington Branch, NAACP, Bernard Peyton, Athena Hawkins, Linda John, and Ian John (collectively, "Plaintiffs") respectfully submit this memorandum of law in support of their motion for a preliminary injunction, pursuant to Federal Rule of Civil Procedure 65.

## PRELIMINARY STATEMENT

This is an action against defendants Town of Huntington, New York, Town Board of The Town of Huntington (the "Town Board"), and Town of Huntington Planning Board (the "Planning Board") (collectively, the "Town" or "Defendants") for violations of the fair housing laws. The action specifically challenges the exclusion of families with children and minorities from the developments known as Sanctuary at Ruland Road ("Ruland Road") and the Greens at Half Hollow (the "Greens").

The need for affordable family housing in Huntington is longstanding. Consistent with that need, in July 1999, SBJ Associates, LLC (together with Ruland Road LLC, the "Developer") submitted to the Town a change of zone application in order to permit the construction of 92 two-bedroom and 30 three-bedroom affordable rental units at the Ruland Road site. Such units were supposed to, among other things, mitigate the lack of affordable family housing at the Greens site, where the Developer planned to construct 1,300 age-restricted senior citizen housing units and 75 non-age restricted single family luxury homes.

The two- and three-bedroom plan for Ruland Road was never acted upon by the Town. Instead, a year later, the Town directed the Developer to withdraw the two- and three-bedroom plan and to replace it with a plan for *all one-bedroom units* which, as a representative of the Developer has admitted, are "not really desirable" and are "much more difficult to sell." (Hacker

Decl. Ex. 1 at 25:15-19.) [1]  Consistent with such direction, the Developer withdrew its plan to construct affordable family housing at the Ruland Road site and, on September 11, 2000, submitted a new application calling for the construction of all one-bedroom units.  The very next day, the Town passed a resolution amending its zoning laws to allow for the development of the Greens site.  As the Developer has testified, such approval was contingent on its submission of an all one-bedroom plan for Ruland Road.  (Hacker Decl. Ex. 5 at 127:18-128:2.)

On March 10, 2010, the Planning Board approved site plans for Ruland Road consisting of all one bedroom units.  The Planning Board's approval of the Ruland Road site plans paves the way for the issuance of building permits and immediate construction at the Ruland Road site.  Plaintiffs bring this motion to enjoin the issuance of building permits for Ruland Road so as to maintain the status quo pending the ultimate resolution of this case.

A preliminary injunction is warranted here because Plaintiffs can demonstrate a likelihood of success on the merits of their claims and, absent an injunction, they will be irreparably harmed.  A violation of the Fair Housing Act ("FHA"), 42 U.S.C. § 3601, can be established by demonstrating either that the challenged action is intentionally discriminatory or that it has a disparate impact on a protected group.  *See Fair Housing in Huntington Comm. v. Town of Huntington*, No. 02-CV-2787 (DRH) (WDW), 2005 WL 3184273, at *2 (E.D.N.Y. Nov. 29, 2005) (*Huntington III*).  Here, the Town's decision to limit Ruland Road to all one-bedroom units was made with discriminatory intent and has a discriminatory impact on families with children and minorities.  As a result, Plaintiffs are likely to succeed on their claims for violations of the Fair Housing Act.  *See id.* at *3 ("[G]iven the Town's alleged history of discriminatory

---

[1]  Citations to the "Hacker Decl. Ex. __" are to documents attached as exhibits to the Declaration of Gary J. Hacker, dated March 22, 2010, submitted herewith.

2

policies, coupled with its alleged inaction with regard to the multi-family proposal, followed by its immediate action concerning the revised proposal, which allegedly will attract less minorities, . . . Plaintiffs have alleged more than a duty to provide low income housing; they have alleged that Defendants' actions, policies, and procedures have prevented the development of housing most likely to attract minority families.").[2]

Moreover, irreparable harm here is indisputable.  Absent a preliminary injunction, the construction of one-bedroom units will commence and, should Plaintiffs succeed on their claims, the ability of the Court to fashion an appropriate remedy will be thwarted.  Accordingly, a preliminary injunction is required to protect Plaintiffs' rights and to maintain the status quo pending the ultimate disposition of this case.

## PROCEDURAL HISTORY

On May 8, 2002, plaintiffs Fair Housing in Huntington Committee, Senaye Green, Bernard Peyton, and Robert Ralph filed a complaint (the "Original Complaint") against the Town and SBJ Associates LLC.  The Original Complaint challenged the exclusion of minorities and families with children from the Greens site.

On May 17, 2002, the plaintiffs filed a motion seeking to preliminarily enjoin construction at the Greens.  Thereafter, on June 26, 2002, the Court issued an order denying the plaintiffs' motion for a preliminary injunction.[3]  The plaintiffs subsequently appealed the order.

On appeal, the Second Circuit upheld the Court's denial of the plaintiffs' motion for a preliminary injunction.  In doing so, however, the Second Circuit noted that "[a]s a condition of

---

[2]  As set forth below, evidence developed during discovery supports the Court's holding.

[3]  The Court based its decision, in part, on the fact that the Greens development was well under way and that there was a "continued need for senior citizen housing in the Town of Huntington." June 26, 2002 Transcript at 77:15-17, 79:9-13.  Neither concern is present here.

the change of zoning, and as a prerequisite to permitting the final phase of the Greens project, [the Developer] must develop another site it owns within the Town – referred to by the parties as the Ruland Road site – with affordable, multi-unit family housing" and that such a measure "appears to be designed to mitigate the impact of The Greens with regard to family housing." *Fair Housing in Huntington Comm. Inc. v. Town of Huntington, N.Y.*, 316 F.3d 357, 367 (2d Cir. 2003) (*Huntington II*). The Second Circuit further noted that Ruland Road is being limited to one-bedroom and studio apartments and that "Plaintiffs produced evidence from their expert . . . that one-bedroom and studio apartments, even absent an age restriction, will attract a disproportionately white pool of occupants." *Id.* According to the Second Circuit, such evidence "calls into question the effectiveness" of the planned development of Ruland Road as a means of mitigating the lack of affordable family housing at the Greens. *Id.* at 368.

In conformance with the Second Circuit's opinion, Plaintiffs filed an amended complaint (the "Amended Complaint") on April 8, 2004 specifically challenging the exclusion of minorities and families with children from both the Greens and Ruland Road. Thereafter, on or about August 30, 2004, the Town moved to dismiss the Amended Complaint. On March 23, 2005, the Court granted the motion and dismissed the action.

On April 6, 2005, Plaintiffs moved the Court for reconsideration of the March 23, 2005 Order. In that motion, Plaintiffs argued that the Court failed to consider allegations supporting Plaintiffs' claim of disparate impact on minorities and families with children seeking housing in Huntington, as well as numerous factual allegations supporting Plaintiffs' claim of intentional discrimination. On November 29, 2005, the Court issued an opinion granting reconsideration and denying the Town's motion to dismiss the Amended Complaint. *See Huntington III*, 2005

WL 3184273, at *5.  In doing so, the Court held that Plaintiffs had sufficiently alleged claims for violations of the fair housing laws.  *See id.* at *3.[4]

## FACTUAL BACKGROUND

### A.    Acquisition of the Green and Ruland Road Sites

In 1999, the Developer purchased the 382-acre site that became known as the Greens from the State of New York in order to construct 1,300 age-restricted senior citizen housing units and 75 non-age restricted, four- and five-bedroom luxury homes.  According to Jack Libert, the former CEO of the Developer's real estate division, during discussions with the Town regarding the development of the Greens site, the Developer was told by the Town that, in order to offset the planned construction of age-restricted and luxury housing at the site, the Developer would have to make some provision for the construction of non-age restricted, affordable family housing.  (Hacker Decl. Ex. 1 at 39:23-40:16.)  As a result, in late 1998 or early 1999, the Developer purchased the 8.5 acre Ruland Road site, with an eye toward building non-age restricted, affordable family housing.  (*See id.*)

---

[4]  On May 3, 2006, pursuant to the Court's direction in a February 22, 2006 Order denying the Town's motion to amend the Court's November 29, 2005 Order to include a certificate of appealability, the Town moved to dismiss the Amended Complaint for (i) failure to comply with the applicable statute of limitations and/or laches, and (ii) failure to join necessary parties, two arguments that had previously been made by the Town but not addressed in the Court's previous Orders.  That motion was removed from the Court's docket after the parties informed the Court that the case was settled.  The Town, however, subsequently refused to comply with the terms of the settlement and Plaintiffs filed a motion with the Magistrate Judge seeking enforcement of the settlement.  That motion was denied by the Magistrate Judge on March 31, 2008.  Thereafter, on May 12, 2008, the Town resubmitted its Motion to Dismiss.  That motion, along with an appeal of the Magistrate Judge's denial of Plaintiffs' motion to enforce the settlement agreement, remain pending before the Court.

**B.      The Developer Proposes the Construction of Affordable Family Housing at Ruland Road**

In or about July 1999, the Developer submitted a development proposal to the Town calling for the construction of 92 two-bedroom and 30 three-bedroom affordable, rental units at Ruland Road.  (Hacker Decl. Ex. 2.)  The proposal was never acted upon by the Town.

**C.      The Town Directs the Developer to Withdraw its Plan for Affordable Family Housing at Ruland Road**

In June 2000, at the Town's behest, the Developer withdrew its July 1999 application to construct two- and three-bedroom affordable rental units at the Ruland Road site and indicated that it planned to submit a revised plan calling for the construction of all one-bedroom units. (Hacker Decl. Ex. 3.)  According to the Developer, approval of the Greens and Ruland Road applications by the Town was specifically conditioned on the change from a two- and three-bedroom plan for Ruland Road to an all one-bedroom plan.  (Hacker Decl. Ex. 4 at TOH001554; Exhibit 5 at 127:18-128:2.)

**D.      The Planning Board and Planning Department Question the Propriety of An All One-Bedroom Plan For Ruland Road**

In an August 4, 2000 memorandum to the Town Board, the Planning Board specifically questioned the propriety of an all one-bedroom plan for Ruland Road.  (Hacker Decl. Ex. 6.) The Planning Board asked, among other things, how it can "be assured that the affordable housing at Ruland Road will ever be built."  (*Id.*)  In addition, the Planning Board inquired as to how one-bedroom units at Ruland Road will "address the need for affordable housing for families" and whether "any studies [have been] done on the need for affordable housing for families in Town." (*Id.*)  Significantly, such concerns were never addressed by the Town Board.

6

**E.     The Developer Submits A Formal Application For the Construction Of All One-Bedroom Units At Ruland Road**

Consistent with the Town's direction, on September 11, 2000, the Developer filed with the Town its application to change the zoning of the Ruland Road site in order to permit the construction of 122 one-bedroom, affordable rental units.  (Hacker Decl. Ex. 7.)  Just one day later, on September 12, 2000, the Town amended its zoning to allow the construction of 75 non-age restricted four- and five-bedroom luxury homes and 1,300 senior citizen age-restricted housing units at the Greens site ("Resolution No. 2000-684").  (Hacker Decl. Ex. 8.)

Resolution No. 2000-684 did not call for the construction of any affordable family housing units at the Greens site.  Instead, the Resolution required that the Developer construct approximately 120 one-bedroom, non-age restricted affordable housing units at the Ruland Road site.  (*Id.* at TOH000571.)  In addition, in order to ensure that the affordable units at Ruland Road actually got built, the Resolution mandated that "no building permit shall be issued for 200 of the market value condominium units at The Greens Project until such time as building permits are issued for *all* of the units at the Sanctuary Project at Ruland Road."  (*Id.* (emphasis added).)

Approximately two months later, on November 21, 2000, the Town passed Resolution No. 2000-850, which amended its zoning laws to permit the development of "122 one-bedroom affordable housing units, affordable to households earning no more than 80% of MSI for Nassau/Suffolk based on household size" at Ruland Road. [5]   (Hacker Decl. Ex. 10.)

---

[5]   As this resolution makes clear, any affordable housing built at Ruland Road is required to be affordable to households earning no more than 80% of the median income for Nassau and Suffolk Counties.  This is supported by additional evidence, including the testimony of Jack Libert, the former CEO of the Developer's real estate division.  (Hacker Dec. Ex. 1 at 104:20-105:13.)  Nevertheless, in a December 11, 2009 letter to the Town, the Developer stated that it intends to sell the units at Ruland Road at a price derived from an affordability formula based upon "120% of the median income for Suffolk County."  (Hacker Decl. Ex. 9.)  The Ruland Road site plan approved by the Planning Board on March 20, 2010 did not indicate at what price
*(cont'd)*

Significantly, at the public hearing on the Resolution, Councilman Cuthbertson introduced an amendment that would have deleted the reference to "one-bedroom" units and deferred the issue of bedroom allocation to the Planning Board.  (Hacker Decl. Ex. 11 at 180:16-181:3.)   The amendment, however, was defeated by a three to two vote.

### F.  The Town Grants Building Permits For All Market Rate Units At The Greens

In direct violation of Resolution 2000-684, the Town granted building permits for *all* of the market value condominium units at the Greens prior to *any* building permits being issued for affordable housing units at Ruland Road.  (Hacker Decl. Ex. 12  at 101:16-102:8.)

### G.  The Developer's Affordable Housing Tax Credit Applications Are Denied

On at least two occasions, the Developer filed applications with the New York State Division of Housing and Community Renewal ("DHCR") seeking tax credits for the Ruland Road development.  (Hacker Decl. Exs. 4, 13.)  According to the Developer, the one-bedroom units at Ruland Road were to be "affordable to households at or below 60% of the area median income and rent for $905 per month."  (Hacker Decl. Ex. 4 at TOH001553.)  The DHCR denied the applications because, among other things, the project was limited to one-bedroom units. (Hacker Decl. Ex. 13.)

### H.  The Developer Brings An Article 78 Proceeding Against the Town Seeking To Compel The Planning Board to Vote On Its Site Plan Application for Ruland Road

In October 2008, the Developer brought an action pursuant to Article 78 of the New York Civil Practice Law and Rules against the Town and Planning Board seeking, *inter alia*, an order from the court directing the Planning Board to vote on its site plan application for Ruland Road.

---

*(cont'd from previous page)*
the units must be offered.  Because Plaintiffs are not aware of any final decision by the Town on pricing, Plaintiffs do not substantively address the price issue herein.   Plaintiffs believe, however, that utilizing a formula based on 120% of median income would render the project not affordable.

(Hacker Decl. Ex. 14.)  In that action, the Developer asserted that the Town had been delaying consideration of a site plan for Ruland Road for several years and continued to "seek delay in furtherance of [the Town's] desire . . . to limit the availability of residential units for families in the Town." (Hacker Decl. Ex. 15 at ¶ 2.)

According to the Developer, in accordance with the Town's "preference" for all one-bedroom units at Ruland Road, in or about 2002, it submitted a site plan application calling for the construction of 120 one-bedroom units at the site.  (Hacker Decl. Ex. 14 at ¶¶ 16-18.) Thereafter, on February 5, 2008, the Developer submitted a revised site plan, this time calling for the construction of 94 one-bedroom units and 28 two-bedroom units.  (*Id.* at ¶¶ 23-24.)

The Developer subsequently met with representatives of the Town, including the Town Supervisor, Frank Petrone, regarding the Ruland Road development.  (Hacker Decl. Ex. 16 at 158:2-162:6.)  At that meeting, the Town made clear that the "[Ruland Road] application would not move forward unless it was all one bedrooms."  (*Id.* at 161:15-22.)  Supervisor Petrone's "exact words were, 'This project will be all one-bedroom units.'"[6]  (*Id.* at 162:3-6.)  As a result, in October 2008, at the Town's "insist[ence]," the plans were changed back to include only one-bedroom units.  (Hacker Decl. Ex. 15 ¶¶ 4-5.)

On March 6, 2009, the court dismissed the Developer's Article 78 petition, but "with leave to renew in the event that [the Town] fail[ed] to render a determination on the subject application within the period of time provided by law."  (Hacker Decl. Ex. 17.)  The court continued to hold periodic status conferences with the parties.

---

[6]  Supervisor Petrone has testified that the Developer will build whatever the Town instructs them to build.  (Hacker Decl. Ex. 12 at 106:13-17.)

I.      **The Planning Board Approves A Site Plan For Ruland Road Consisting of All One-Bedroom Units**

On or about January 14, 2010, the Developer filed with the Town revised site plans for Ruland Road, which called for the construction of 122 one-bedroom units at the site.  At a March 10, 2010 meeting, the Planning Board voted to approve the all one-bedroom site plan (albeit for only 117 units).

## ARGUMENT

I.      **LEGAL STANDARD FOR INJUNCTIVE RELIEF**

A party seeking preliminary injunctive relief must demonstrate "'(1) irreparable harm should the injunction not be granted, and (2) . . . a likelihood of success on the merits.'"  *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995) (citation omitted); *see also Huntington II*, 316 F.3d at 365.[7]

II.     **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS**

In 1968, Congress enacted the FHA to "provide . . . for fair housing throughout the United States."  42 U.S.C. § 3601.  The statue makes it unlawful to "[t]o refuse to sell or rent . . . or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion,

---

[7]    "[T]o the degree that an injunction 'will alter, rather than maintain the status quo, or will provide the movant with . . . relief [that] cannot be undone even if the defendant prevails at a trail on the merits, the moving party must show a clear or substantial likelihood of success."  *Huntington II*, 316 F.3d at 365 (citation omitted).  In *Huntington II*, the Second Circuit applied the "clear or substantial likelihood of success" standard because the plaintiffs sought, among other things, to halt construction at the Greens site.  *Id.*  The Second Circuit held that such relief would be "mandatory in nature because it [would] 'change the position of the parties as [it] existed prior to the grant.'"  *Id.*  Here, the Town has yet to issue building permits for the Ruland Road site and construction has not begun.  Plaintiffs simply seek to maintain the *status quo* by enjoining the issuance of such permits, which is a prerequisite to the commencement of construction.  Because such relief, if granted, will not "'change the position of the parties as [it] existed prior to the grant,'" the more stringent "clear or substantial likelihood of success" standard is inapplicable here.  *Id.*

sex, familial status, or national origin." 42 U.S.C. § 3604(a).[8] According to the Second Circuit, the phrase "otherwise make unavailable" "has been interpreted to reach a wide variety of discriminatory housing practices, including discriminatory zoning restrictions." *Le Blanc-Sternberg v. Fletcher*, 67 F.3d 412, 424 (2d Cir. 1995); *see also Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926, 938-41 (2d Cir. 1988) (*Huntington I*) (holding that "[Huntington] violated [the FHA] by refusing to amend the zoning ordinance to permit private developers to build multi-family dwellings outside the urban renewal area").

A plaintiff may establish a violation of the FHA by demonstrating either that the challenged act is intentionally discriminatory or that it has a disparate impact on a protected group or groups – here, families with children and/or minorities. *See Huntington III*, 2005 WL 3184273, at *2; *LeBlanc-Sternberg*, 67 F.3d at 425. In the present case, the record evidence demonstrates that the Town's actions with regard to Ruland Road violated the FHA under both the discriminatory intent and discriminatory impact standards. Plaintiffs are, therefore, likely to succeed on the merits of their claims.

### A.  The Town Has Engaged In Intentional Discrimination in Violation of the Fair Housing Act and Other Applicable Civil Rights Laws

To establish a claim for intentional discrimination, a plaintiff must prove that race, color, religion, sex, familial status, or national origin was "a motivating factor in the [defendants'] decision." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977).[9]

---

[8]  In 1988, the FHA was amended to include familial status as a protected class. *See Fair Housing Council of Orange County, Inc. v. Ayres*, 855 F. Supp. 315, 316-17 (C.D. Cal. 1994).

[9]  Cases articulating the standards for showing discriminatory intent under the Equal Protection Clause of the United States Constitution are also used to govern FHA claims premised on an intentional discrimination theory. *See LeBlanc-Sternberg*, 67 F.3d at 425-26. That the Town has intentionally discriminated against Plaintiffs is also at the core of Plaintiffs' claims under the Equal Protection Clause of the United States Constitution, 42 U.S.C. § 1982, and 42 U.S.C. §
*(cont'd)*

In determining whether a plaintiff can establish a claim of discriminatory intent, a court must conduct a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266.  Discriminatory intent may be inferred from the totality of the circumstances.  *See Washington v. Davis*, 426 U.S. 229, 242 (1976).  In examining all of the evidence, a court should consider several factors including, but not limited to, "(1) the discriminatory impact of the action, (2) the historical background of the action, (3) the sequence of events leading up to the challenged action, (4) departures from normal procedural sequences, and (5) departures from normal substantive criteria." *Sunrise Dev., Inc. v. Town of Huntington, N.Y.*, 62 F. Supp. 2d 762, 774 (E.D.N.Y. 1999) (citing *Arlington Heights*, 429 U.S. at 266-68).  The plaintiff need only show that discriminatory intent was one motivating factor out of many.  *See United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1217 (2d Cir. 1987).

Once a plaintiff demonstrates that the challenged decision was in part motivated by a discriminatory purpose, the burden shifts to the defendant to establish that the same decision would have resulted even if the impermissible purpose had not been considered.  *See Yonkers Bd. of Educ.*, 837 F.2d at 1217.  The defendant's justification is scrutinized to determine if it is pretextual because, "if the motive is discriminatory, it is of no moment that the complained-of conduct would be permissible if taken for nondiscriminatory reasons." *LeBlanc-Sternberg*, 67 F.3d at 425.

Here, the evidence overwhelmingly supports a finding that the Town's actions regarding Ruland Road were based, and continue to be based, on improper discriminatory intent with respect to both familial status and race and national origin.

_____

(cont'd from previous page)
1983.  *See Huntington III*, 2005 WL 3184273, at *4-5 (denying motion to dismiss these claims because discriminatory intent was properly alleged).

1.   **The Town's Actions With Regard to Ruland Road Will Have a Discriminatory Impact on Families with Children and Minorities**

As set forth below in the discussion of the disparate impact standard of proof, the record here conclusively demonstrates that the Town's requiring the Developer to withdraw its plan for affordable family housing at Ruland Road and replace it with an all one-bedroom plan disproportionately impacts both families with children and minorities. *See infra.* Part II.B. Such a clearly disproportionate impact is highly probative of the Town's intent. *See, e.g.*, *Valdez v. Town of Brookhaven*, No. 05-CV-4323(JS)(ARL), 2005 WL 3454708, at *15 (E.D.N.Y. Dec. 15, 2005).

2.   **The Historical Background of the Town's Decisions Demonstrate a Pattern and Practice of Discrimination**

The historical background of the disputed decisions is important in a discriminatory intent analysis, "particularly if it reveals a series of official actions taken for invidious purposes." *Arlington Heights*, 429 U.S. at 267. Here, the historical background reveals a pattern and practice of racial and ethnic discrimination in Huntington based primarily on its consistent failure to provide affordable housing.

In *Huntington I*, the Second Circuit examined the Town's prior history as part of the cumulative evidence which justified the grant of relief at that time. *See Huntington I*, 844 F.2d at 941-42. The Second Circuit found that the Town's history "clearly demonstrates a pattern of stalling efforts to build low-income housing." *Id.* at 942. More than twenty years later, the pattern of stalling persists.

As Defendants are well aware, Huntington has a longstanding shortage of affordable family housing which continues to this day. The Town's 1993 Comprehensive Plan Update states that "[h]igher-density development [such as the Greens and Ruland Road] can only be justified in those instances where a public benefit is realized, particularly in the provision of

13

housing more affordable to a greater variety of individuals and *households*."  (Hacker Decl. Ex. 18 at 4-21 (emphasis added).)  Moreover, in its 2000 Consolidated Plan, the Town specifically recognized that the need for affordable *family* housing exceeded the need for all other types of housing, including senior housing.  (Hacker Decl. Ex. 19 at 45.)

This need for affordable family housing in Huntington has not abated.  The Town's recently released Draft Consolidated Plan for 2010-2014 explicitly states that increasing affordable housing for families is a "housing priority" for the Town and that "[l]arge families . . . are experiencing the most difficulty with suitable and affordable housing."  (Hacker Decl. Ex. 20 at 27, 33.)  Clearly, a one-bedroom plan for Ruland Road cannot meet this need.

The Town's continued refusal to permit the construction of affordable family housing in the face of longstanding need for such housing, coupled with its intentional crafting of the Ruland Road project, has *increased* the level of racial segregation and severely limited housing available to families with children in Huntington (*see infra* Part II.B.), and is highly probative of Defendants' intentional discrimination against both families with children and minorities.  *See Yonkers Bd. of Educ.*, 837 F.2d at 1219-21.  This is particularly true given the fact that the Town has repeatedly acknowledged the overwhelming need for affordable family housing, even while directing the Developer away from servicing that need.  *See, e.g.*, *Atkins v. Robinson*, 545 F. Supp. 852, 879 (E.D. Va. 1982) (finding that discriminatory racial intent existed where city's veto of proposed low-income housing project was in stark contrast to the city's "professed desire to take steps to serve housing needs and improve the housing conditions of its residents").

Defendants' opposition to affordable multi-bedroom housing at Ruland Road when viewed in the context of its long and deep-rooted history of impeding the development of affordable family housing in a manner that exacerbates the longstanding residential segregation

14

in Huntington, as described by the Second Circuit in *Huntington I*, is strong evidence of Defendants' discriminatory racial intent.  *See Huntington I*, 844 F.2d at 929, 937.[10]

### 3. The Specific Sequence of Events Reveals Defendants' Discriminatory Intent

As the Supreme Court explained in *Arlington Heights*, the sequence of events preceding the challenged decision is also important in determining discriminatory intent.  *See Arlington Heights*, 429 U.S. at 267.  Evidence obtained since *Huntington II* concerning the sequence of events leading up to the Town's decision to require the housing built at Ruland Road to consist solely of one-bedroom units further demonstrates Defendants' discriminatory intent.

The primary purpose of the Ruland Road project was purportedly to mitigate the lack of non-age restricted, affordable family housing at the Greens.  (*See* Hacker Decl. Ex. 21 at 1 (stating that the purpose of the Ruland Road project is to address the need, raised during the Greens deliberations, "for additional affordable housing for families").)  To that end, in or about July 1999, the Developer submitted to the Town its proposal for the construction of 92 two-bedroom and 30 three-bedroom affordable, rental units at Ruland Road.  (Hacker Decl. Ex. 2.) As mentioned, the Town never voted on that plan.

Instead, the Town required the Developer to withdraw its application for affordable family housing at Ruland Road and to instead submit a new plan calling for the construction of all one-bedroom units.   (Hacker Decl. Ex. 4 at TOH001554; Ex. 5 at 127:18-128:2.) Significantly, the Town's own Planning Board was critical of such a plan, asking, among other

---

[10]   Moreover, unlike *Huntington I*, this case includes a familial status claim.  Here, the Town's resistance to affordable family housing in the face of a strong and acknowledged need for such housing, and its simultaneous encouragement of affordable senior and one-bedroom housing, is strong evidence of intentional discrimination against families with children.  *See infra* Part II.B.

things, how it would "address the need for affordable housing for families."  (Hacker Decl. Ex. 6.)  The Planning Board's concerns were ignored.

On September 11, 2000, the Developer formally filed with the Town its application to change the zoning of the Ruland Road site in order to permit the construction of 122 one-bedroom units.  (Hacker Decl. Ex. 7.)  Just *one day* later, the Town approved a resolution amending its zoning code to permit the construction of 75 non-age restricted four- and five-bedroom homes and 1,300 age-restricted units at the Greens.  (Hacker Decl. Ex. 8.)  As mentioned, such approval was contingent on the Developer's withdrawal of its plan for affordable family housing at Ruland Road and its subsequent submission of an all one-bedroom plan.  (Hacker Decl. Ex. 4 at TOH001554; Ex. 5 at 127:18-128:2.)  Thereafter, on November 21, 2000, the Town passed a resolution amending its zoning laws to permit the development of "122 one-bedroom affordable housing units, affordable to households earning no more than 80% of MSI for Nassau/Suffolk based on household size" at Ruland Road.  (Hacker Decl. Ex. 10.)

In February 2008, the Developer submitted a revised site plan for Ruland Road calling for the construction of 94 one-bedroom units and 28 two-bedroom units.  (Hacker Decl. Ex. 14 at ¶¶ 23-24.)  In a subsequent meeting with representatives of the Town, including Supervisor Petrone, the Developer was told that its application would not move forward unless it was for all one-bedroom units.  (Hacker Decl. Ex. 16 at 158:2-159:22.)  As a result, in October 2008, the Developer once again revised the plans for Ruland Road to include only one-bedroom units. (Hacker Decl. Ex. 15 at ¶¶ 4-5.)

This sequence of events strongly indicates discriminatory intent on the part of Defendants.  *See, e.g., Huntington III*, 2005 WL 3184273, at *3 ("[G]iven the Town's alleged history of discriminatory policies, coupled with its alleged inaction with regard to the multi-

family proposal, followed by its immediate action concerning the revised proposal, which allegedly will attract less minorities, . . . Plaintiffs have alleged more than a duty to provide low income housing; they have alleged that Defendants' actions, policies, and procedures have prevented the development of housing most likely to attract minority families."). Indeed, courts have routinely drawn inferences of discriminatory intent where, as here, a town inexplicably disregards the recommendations of its own staff and planning committees. *See, e.g.*, *Sunrise Dev.*, 62 F. Supp. 2d at 775 (inference of discriminatory animus against disabled was raised, and motion for preliminary injunction granted, where Huntington "disregarded its own [Citizen's Advisory Committee's] recommendations for future development"); *Dews v. Town of Sunnyvale*, 109 F. Supp. 2d 526, 572 (N.D. Tex. 2000) (holding that specific sequence of events factor pointed to discriminatory intent "with regard to Sunnyvale's history of ignoring the recommendations of its planners and proceeding in the face of sound legal and planning advice"). Moreover, the inference of discriminatory intent is particularly strong here because the Town has never proffered any justification for its insistence on all one-bedroom units. *See, e.g.*, *2922 Sherman Ave. Tenants' Ass'n v. Dist. of Columbia*, 444 F.3d 673, 683 (D.C. Cir. 2006).[11]

### 4. Defendants Have Departed From Normal Procedural Sequences and Normal Substantive Criteria

The last two factors of the *Arlington Heights* test analyze whether the decision-making party has departed from normal procedural sequences. *See Arlington Heights*, 429 U.S. at 267.

---

[11]   The absurdity of limiting Ruland Road to one-bedroom units is perhaps best exemplified by the fact that the majority of affordable units at the Greens, which are all age-restricted, have at least two-bedrooms. Indeed, as the former CEO of the Developer's real estate division testified, "one-bedroom units for sale [are] not really desirable" and it is "much more difficult to sell one-bedroom units than two, even to single elderly people." (Hacker Decl. Ex. 1 at 25:15-19.)

Here, as discussed in detail above, the record reflects numerous departures from both normal procedural sequences and normal substantive criteria.

Examples of Defendants' departures from normal procedural sequences include:

- The Town's failure to vote on the original two- and three-bedroom plan for Ruland Road for more than a year, in contrast to the Town's vote to approve a zoning change for the Greens the day after the plan for Ruland Road was revised to include only one-bedroom units. (Hacker Decl. Ex. 8.)

- The Town's conditioning approvals for both the Greens and Ruland Road on the Developer withdrawing its plan for affordable family housing at Ruland Road and replacing it with a plan for all one-bedroom units without formal resolution or formal rejection of the original multi-bedroom plan. (Hacker Decl. Ex. 4 at TOH001554; Ex. 5 at 127:18-128:2.)

- The Town's granting of building permits for *all* of the market value condominium units at the Greens prior to *any* building permits being issued for affordable housing units at Ruland Road, despite the express prohibition against doing so set forth in Resolution 2000-684. (Hacker Decl. Ex. 8; Ex. 12 at 101:16-102:8.)

- The Town Board's failure to address concerns of the Planning Board regarding the propriety of an all one-bedroom plan at Ruland Road. (Hacker Decl. Ex. 6.)

- The Planning Board's multi-year delay in voting on the site plan for Ruland Road. (Hacker Decl. Exs. 14, 15.)

Examples of Defendants' departures from normal substantive criteria include:

- The Town's continued insistence on all one-bedroom units at Ruland Road despite the fact that its own planning documents state that the need for affordable family housing in the Town exceeds the need for all other types of housing. (Hacker Decl. Ex. 18 at 4-21; Ex. 19 at 45; Ex. 20 at 27, 33.)

- The Town's continued insistence on all one-bedroom units at Ruland Road despite the fact that Affordable Housing Requirement contained in the Town Zoning Code mandates that "[e]very residential subdivision of land or site plan that results form an applicant-initiated zone change, resulting in an intensification over the original zoning," must comply with certain requirements for constructing affordable housing, including that "fifty (50%) percent" of the non-age restricted affordable homes created pursuant to the Requirement "*have two (2) or more bedrooms*." (Hacker Decl. Ex. 22 at § 198-13(I)(1)(a) (emphasis added).)

18

These facts serve to highlight the irrationality of the Town's decision to require that the Developer build only one-bedroom units at Ruland Road and are further proof of Defendants' discriminatory intent.[12]

**B.     The Town's Actions Relating to the Ruland Road Project Have a Disparate Impact on Families with Children and Minorities In Violation of the Fair Housing Act**

That Plaintiffs are likely to succeed on the merits of their intentional discrimination claims alone justifies issuance of a preliminary injunction. *See, e.g.*, *Valdez*, 2005 WL 3454708, at *16. Nevertheless, a preliminary injunction is also warranted because Plaintiffs are equally likely to succeed on their FHA claims under a disparate impact analysis.

In order to establish a *prima facie* claim for disparate impact under the FHA, a plaintiff need only show that an outwardly neutral practice "'actually or predictably results in . . . a discriminatory effect.'" *Huntington I*, 844 F.2d at 934 (citation omitted). The plaintiff may do so by showing that a policy, practice or act has an (i) "adverse impact on a particular minority group" or (ii) harms the community in general "by the perpetuation of segregation." *Id.* at 937.[13]

Once a plaintiff has demonstrated a disparate impact, the burden shifts to the defendant to prove that "its actions furthered, in theory and in practice, a legitimate, bona fide governmental interest *and* that no alternative would serve that interest with less discriminatory effect." *Huntington I*, 844 F.2d at 936 (emphasis added). According to the Second Circuit, "in the end there must be a weighing of the adverse impact against the defendant's justification." *Id.*

---

[12]   Discovery in this matter is ongoing and may reveal further evidence of discriminatory intent.

[13]   A disparate impact analysis is equally applicable to familial status discrimination. *See, e.g.*, *Fair Hous. Counsel of Orange County, Inc. v. Ayres*, 855 F. Supp. 315 (C.D. Cal. 1994); *see also, e.g.*, *Huntington I*, 844 F.2d at 937; *Huntington III*, 2005 WL 3184273, at *2.

In balancing a plaintiff's *prima facie* case against a defendant's justification, two factors are particularly important.  First, if a plaintiff presents evidence of discriminatory intent, that evidence weighs on the plaintiff's side of the balance in the court's assessment of whether the discriminatory policy or practice can be justified.  *Id.*  Second, when a plaintiff seeks merely to require a governmental defendant to eliminate some obstacle to housing and not require the defendant to build such housing, the defendant has to establish a more substantial justification for its adverse action.  *Id.*  Both of these factors weigh heavily in Plaintiffs' favor.

### 1.    The Town's Requiring An All One-Bedroom Plan for Ruland Road Has A Discriminatory Impact on Families with Children  and Minorities

Courts considering the extent of the adverse impact of a practice challenged under the FHA typically compare, through statistical analysis, (i) the percentage of all persons affected by the practice against (ii) the percentage of the protected class affected by the practice, and (iii) measure the ratio of that difference.  *See, e.g.*, *Huntington I*, 844 F.2d at 938; *Charleston Hous. Auth. v. United States Dep't of Agric.*, 419 F.3d 729, 741 (8th Cir. 2005).  Plaintiffs must ultimately "demonstrate that the objected-to action results in, or can be predicted to result in, a disparate impact upon a protected class compared to a relevant population as a whole." *Id.* at 740-41.

A statistical analysis by Plaintiffs' expert, Professor Andrew A. Beveridge, demonstrates that the change from a two- and three-bedroom affordable plan for Ruland Road to an all one bedroom plan will have a discriminatory impact on both families with children and minorities.

(a)      **Disparate Impact on Families with Children**

By requiring the Developer to withdraw its plan for affordable multi-bedroom housing at Ruland Road and replace it with a plan for all one-bedroom units, the Town has excluded from the development a disproportionately higher percentage of families with children.[14]   According to Professor Beveridge's analysis, whereas nearly all families with children from within the relevant income band would be able to occupy Ruland Road if it consisted of multi-bedroom units, the change to a one-bedroom plan for Ruland Road excludes on overwhelming 97.5% of families with children in that income band.  (Beveridge Decl. ¶ 13.)[15]   Such findings are certainly not surprising as common sense dictates that families with children are less likely to, and less able to, move into apartments with only one bedroom.  *See, e.g.*, *Ayres*, 855 F. Supp. at 318 (holding that landlord defendant's two-person-per room occupancy limit violated FHA as a matter of law because it had a disparate impact on families with children, noting, "[b]y refusing to rent to families composed of three or more persons, defendant excludes a large percent of families with children from renting apartments").

(b)      **Disparate Impact on Minorities**

The Town's insistence on an all one-bedroom plan for Ruland Road also has a disproportionately high exclusionary impact on racial minorities.  As Professor Beveridge's analysis indicates, if Ruland Road were a multi-bedroom affordable development, the likely

---

[14]   Where, as here, a defendant's actions prevent a development from being constructed, precise data about who would in fact reside in the relevant housing is not available.  Courts, therefore, use the best data available to determine the composition of the pool of likely residents.  *See, e.g.*, *Huntington I*, 844 F.2d at 938 (comparing the percentages of those whose incomes qualified them for subsidized housing).

[15]   Citations to "Beveridge Declaration" are to the Declaration of Andrew A. Beveridge, dated March 22, 2010, submitted herewith.

21

racial composition of Ruland Road's residents would be 66% white and 34% non-white. (Beveridge Decl. ¶ 10.)   However, if Ruland Road were an all one-bedroom affordable development, the likely racial composition of Ruland Road's residents would be 87% white and just 13% non-white.  (*Id.*)  As Professor Beveridge explains, these statistics are not surprising because racial minorities tend to have larger families.  (*Id.* ¶ 12.)

Accordingly, Plaintiffs have satisfied their burden of demonstrating that the Town's actions with regard to Ruland Road have a discriminatory impact on both families with children and minorities.

### 2. The Towns' Insistence On An All One-Bedroom Plan for Ruland Road Perpetuates Segregation

A *prima facie* case for racial impact is alternatively satisfied by the perpetuation of residential segregation in Huntington.  The *Huntington I* court recognized this principle more than twenty years ago when it found that the Town had significant residential segregation *see Huntington I*, 844 F.2d at 937, and Professor Beveridge's analysis bears this out.

As Professor Beveridge has concluded, limiting Ruland Road to one bedroom units would result in those units largely being occupied by whites (87%), whereas "[a] plan that utilizes units of varying bedroom numbers would be more inclusive."  (Beveridge Decl. ¶ 11.) As a result, residential segregation is perpetuated by the Town's rejection of a development proposal for two- and three-bedroom affordable units that would have resulted in an increased number of minority families living in the predominantly white community where Ruland Road is located, and its instead approving an all one-bedroom plan that will not.

### 3. The Town Has Not Proffered Any Legitimate Justification for An All One-Bedroom Plan

Once Plaintiffs have satisfied their burden in demonstrating discriminatory impact, the burden falls upon Defendants to put forward a legitimate, bona fide justification for its actions.

*See Huntington I*, 844 F.2d at 936.  Defendants must also demonstrate that *no* alternative would serve the proffered interests with less discriminatory impact.  *See id.*  Defendants cannot do so.

The Town has never proffered an explanation for its unprecedented hostility towards building affordable multi-bedroom housing at Ruland Road and its curious insistence that affordable housing at Ruland Road be limited to one-bedroom units.  As a result, Defendants cannot demonstrate that their actions further in both "theory and in practice . . . a legitimate, bona fide governmental interest and that no alternative would serve that interest with less discriminatory effect."  *Huntington I*, 844 F.2d at 936; *see also, e.g.*, *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 149-50 (3d Cir. 1977) ("[H]ere[,] no justification has been forthcoming from [the defendants] to meet, let alone overcome, the plaintiffs' prima facie case.").

\* \* \*

Because Plaintiffs have demonstrated that rejecting a two- and three-bedroom plan for Ruland Road and instead requiring that only one-bedroom units be constructed at the site will have a disparate impact on both families and children and minorities, and because Defendants have failed to demonstrate that no alternative would serve the proffered interests (whatever they may be) with less discriminatory impact, Plaintiffs are likely to succeed on their FHA claims. *See Valdez*, 2005 WL 3454708, at \*13-\*15; *Bronson v. Crestwood Lake Section 1 Holding Corp.*, 724 F. Supp. 148, 153-58 (S.D.N.Y. 1989).

## III.   PLAINTIFFS WILL BE IRREPARABLY HARMED IF AN INJUNCTION IS NOT ISSUED

Plaintiffs unquestionably will suffer irreparable harm if an injunction is not issued.  As the Supreme Court has noted: "'Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad . . . breadth and flexibility are inherent in equitable remedies.'"  *Hills v. Gautreaux*, 425 U.S. 284, 297 (1976) (citation omitted).

**A.      It Is Presumed that Plaintiffs Have Been Irreparably Harmed Because of Defendants' Discriminatory Conduct.**

In housing discrimination cases, irreparable harm is presumed upon a showing of likely success on the merits.  *See, e.g.*, *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423 (11th Cir. 1984) ("[W]hen a plaintiff who has standing to bring suit shows a substantial likelihood that a defendant has violated specific fair housing statutes and regulations, that alone, if unrebutted, is sufficient to support an injunction remedying those violations.").  The Plaintiffs' strong showing on the merits of its FHA claim (*see supra* Part II) strengthens this presumption and reduces the need for any irreparable harm inquiry.  *See Sunrise Dev.*, 62 F. Supp. 2d at 773 ("[T]he discrimination itself is presumed to cause irreparable harm to its victim.").

**B.      Plaintiffs Have Independently Demonstrated That They Will Be Irreparably Harmed By Defendants' Discriminatory Conduct**

Even if irreparable harm is not presumed, Plaintiffs have nonetheless demonstrated that they will be irreparably harmed if Defendants are permitted to issue building permits or otherwise allow construction of one-bedroom units to move forward at Ruland Road.  In *Stewart B. McKinney Foundation, Inc. v. Town Plan & Zoning Commission*, 790 F. Supp. 1197 (D. Conn. 1992), the court, though presuming irreparable harm, explained that the following factors would support an independent finding of irreparable harm: (i) the plaintiff's goal of providing housing to a protected group would be "thwarted by each passing day;" (ii) a shortage of housing for the protected group; (iii) persons interested in occupying the housing have had to look elsewhere rather than wait; and (iv) monetary damages would not adequately compensate plaintiffs for their inability to provide housing for that protected group.  *Stewart B. McKinney Found.*, 790 F. Supp. at 1208-09.  All of these factors are present here.

Furthermore, "[i]f at the time the merits are reached, the project is well under way, if not complete, the ability of the Court to fashion an appropriate remedy may be limited."  *Vills. of*

24

*Cornwallis Owners Ass'n v. Durham Hous. Auth.*, 894 F. Supp. 236, 239 (M.D.N.C. 1995). Under such circumstances, even if Plaintiffs ultimately prevail, they may well enjoy a pyrrhic victory if building permits for Ruland Road are issued and construction of one-bedroom units moves forward. Accordingly, a preliminary injunction is required to protect Plaintiffs' rights and to maintain the status quo pending the ultimate disposition of this case.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for a preliminary injunction and enjoin Defendants from issuing building permits or otherwise permitting construction to commence at the Ruland Road site.

Dated: New York, New York
      March 22, 2010

Respectfully submitted,

/s/ Gary J. Hacker
Jeffrey Glekel (jeffrey.glekel@skadden.com)
Gary J. Hacker (gary.hacker@skadden.com)
SKADDEN, ARPS, SLATE
  MEAGHER & FLOM LLP
Four Times Square
New York, NY  10036
(212) 735-3000

25